IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JAMES FRANKLIN MICHAUX,           )
                                  )
            Petitioner,           )
                                  )
      v.                          )     1:09CV141
                                  )
THE SECRETARY OF THE NORTH        )
CAROLINA DEPARTMENT OF CORRECTION,)
                                  )
            Respondent.           )

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The pertinent facts of the case, as set out by the North Carolina Court of Appeals, are as follows:

> At trial, the State's evidence tended to show the following facts. In 2002, the Rockingham County Department of Social Services ("DSS") began providing treatment services to defendant; his wife, Serita Michaux; and their two young children. Later in 2002, Ms. Michaux gave birth to twins, one of whom was J.T.M. The social worker assigned to the family testified regarding defendant's domination of Ms. Michaux and his hostility to receiving assistance from DSS.
>
> On one occasion, after J.T.M.'s birth, a restaurant owner, who had known defendant since he was a young boy, observed defendant playing too roughly with the child. After she told defendant, "you're going to hurt that baby," defendant responded: "It's my damn baby. I'll do what I want to." When defendant learned that an employee of the restaurant had urged Ms. Michaux to leave him, defendant threatened to slap the employee and said, "Bitch, ... I'll burn your house down with you in it."
>
> Following a DSS safety assessment during which defendant was "explosive," DSS concluded that the environment for

defendant's children was "unsafe" and, on 25 October 2002, placed J.T.M. and his twin with a foster family. In mid-February 2003, defendant and Ms. Michaux were allowed to have the twins for intermittent trial placements. After one such trial placement, J.T.M. returned to the foster family with noticeable scabbing and bruise marks, including bruising on his abdomen, groin area, and the backs of his thighs. Nonetheless, on 24 March 2003, physical custody of the twins was restored to defendant and Ms. Michaux. Shortly thereafter, on 8 April 2003, J.T.M. was admitted to Morehead Memorial Hospital. Nurse Amy White and other hospital staff examined J.T.M. and observed that he suffered from critical dehydration, a rash on his bottom, and bloody tissue around his rectum. According to Nurse White, J.T.M. was not behaving like a six-month-old, but rather "more like two months" because "he wouldn't lift his head up[,] he wouldn't try to lift his arms[,] he wouldn't put his eyes on you ... [;][h]e was just totally weak." X-rays taken at that time showed fractures to J.T.M.'s ninth and eleventh ribs that could have been caused by squeezing or a blow.

On 15 May 2003, emergency personnel were dispatched to defendant's residence at about 10:30 p.m. for a "cardiac respiratory emergency." When Chief Frazier of the Colfax Fire Department arrived, Ms. Michaux directed him to the back room of the house where defendant was holding J.T.M. When Chief Frazier took the child, he found no pulse and began CPR. Paramedic David Wilkins of the Guilford County Emergency Medical Services attempted to intubate the child in order to provide a direct line of air into the child's lungs. There was no obstruction in the airway prior to the intubation attempt. When J.T.M. could not be revived at the scene, he was transported to High Point Regional Hospital.

When the child arrived shortly after 11:00 p.m. at the hospital, Nurse Misty Hooper noticed that the baby had bruising on the left side of his head, down the left side of his abdomen, on his right lower back, on his leg, and around his diaper line. The child's foot also appeared as if "several layers of skin ... had been peeled back," and his rectum "was macerated ... very abnormal appearing ... [r]aw, almost." Defendant and Ms. Michaux were asked by hospital staff about J.T.M.'s medical history, but they refused to provide the hospital staff with any information. Emergency room physician Dr. David Fisher

-2-

Case 1:09-cv-00141-TDS-DPD   Document 8   Filed 06/22/09   Page 2 of 10

unsuccessfully tried to resuscitate J.T.M. and then pronounced the seven-month-old dead.

Defendant was subsequently interviewed at the hospital by Rhonda Oboh, a social worker with the Guilford County Department of Social Services. He told Ms. Oboh "that he was feeding the child and playing with the child and then the child all of a sudden went limp." Defendant claimed that "he went to stick the bottle in the baby's mouth, and that the child would not take the bottle, and that at that point he knew that something was wrong." Defendant stated that he panicked, attempted CPR, and began tapping the child on his stomach, legs, and chest in order to get the child to respond.

Dr. John D. Butts, Chief Medical Examiner for the State of North Carolina, performed an autopsy of the victim on 16 May 2003. Dr. Butts observed a number of injuries on the child's body: bruises on the chin, forehead, chest, lower abdomen, and legs; tissue loss on the heel; both fresh and healing fractures to several ribs; and bruising in the wall of the small bowel and mesentery. Dr. Butts believed that "these injuries are all blunt force injuries," that "a child of this age isn't capable of incurring these injuries by itself," and that they "were caused by another party." Based on his findings, Dr. Butts concluded that the victim exhibited signs of "battered child syndrome."

In September 2004, defendant was indicted for felony child abuse inflicting serious bodily injury and first degree murder. A superseding indictment on the felony child abuse charge was filed in August 2005. The case proceeded to trial during the 31 October 2005 criminal session of Guilford County Superior Court.

Ms. Michaux, who was herself indicted on murder and child abuse charges, testified at defendant's trial pursuant to a plea agreement. According to Ms. Michaux, on the morning of J.T.M.'s death, she and defendant went to court and regained legal custody of their four children. Later in the day, the family accompanied defendant to his workplace. When the family returned home around 10:00 p.m., Ms. Michaux saw defendant take J.T.M. into the bedroom. After putting food in the oven for the older two children, Ms. Michaux went back to the bedroom and saw defendant choking the victim with his left hand. Ms. Michaux testified that she told defendant to stop, but

defendant replied "it was his kid[,] he could do what he wanted to."

Ms. Michaux left the room to get laundry. She then heard defendant yell that the baby was not breathing. In response, Ms. Michaux called 911. According to Ms. Michaux, defendant instructed her to never tell anyone about what happened the night of J.T.M.'s death. Ms. Michaux testified further that she did not tell the emergency personnel about defendant's choking J.T.M. because she was scared of her husband. She stated that her husband had, in the past, choked her, threatened her with a jigsaw, kicked her in the leg with steel-toed boots, broken a picture over her head, thrown a glass at her, and hit her in the stomach when she was pregnant with the twins.

During her testimony, Ms. Michaux also described various instances of defendant's physical abuse of J.T.M. before the night of his death. Defendant gave J.T.M. blood blisters by smacking his feet with a remote control; burned the victim's ear with a lit cigarette; held the child's nose shut so he could not breathe; and taped the child to the rails of his crib with black tape in order to keep him still while he pushed on his stomach and smacked his face.

Dr. Butts testified at trial that he reached an initial conclusion, following his autopsy, regarding the cause of death:

> My opinion-based on the constellation of injuries I saw and the lack of any obvious natural process, congenital disease or something that might explain the death, it was my opinion and feeling this child had died as a result of external forces or causes of some type. But I didn't-I was unable to identify a specific mechanism by which the child had died or had been killed.

Dr. Butts testified that he subsequently received additional information that prompted him to reassess his initial opinion. Based on this new information, Dr. Butts revised his initial opinion to reflect that "the death was the result of asphyxiation or consistent with asphyxiation" secondary to neck compression. During cross-examination by defendant's counsel, Dr. Butts

explained that the information was from a written statement provided by Ms. Michaux to the police that indicated she saw defendant choke the victim in the bedroom on the night of 15 May 2003.

At trial, defendant offered evidence from several witnesses. Dr. Donald Jason, a professor in pathology who reviewed Dr. Butts' autopsy records, disputed Dr. Butts' diagnosis of battered child syndrome and testified that all the evidence was "perfectly consistent with the child choking on formula." He explained further that "[a]ny attempt at CPR ... would be expected to leave some bruising, depending on how forceful it was. And I found some bruising ... consistent with two fingers over the child's abdomen." Dr. Jason went on: "In any case, this is not a child that died of being beaten to death. This is a child that apparently asphyxiated to death in some manner, although not by strangulation...."

In addition, defendant presented evidence that Ms. Michaux had stated, on the night of J.T.M.'s death, that defendant was innocently trying to feed the child when he stopped breathing. Other witnesses testified that defendant was gentle with the children and a good parent, with any bruising on the child coming from one of the older Michaux children playing roughly around the child. The jury found defendant guilty of felony child abuse inflicting serious bodily injury and first degree murder. On 8 November 2005, the trial court sentenced defendant to life imprisonment without parole for the murder conviction and to a term of 100 to 129 months imprisonment for the felony child abuse conviction. Defendant timely appealed to this Court.

State v. Michaux, No. COA06-1040, at *1-4, 185 N.C. App. 160, 647 S.E.2d 688 (Aug. 07, 2007)(unpublished), rev. denied, 361 N.C. 700, 654 S.E.2d 706 (2007). Following his unsuccessful appeal, Petitioner filed his habeas petition in this Court.

### **Claims In The Petition**

Petitioner raises two interrelated claims for relief in his petition. First, he claims that Dr. Butts' expert opinion that the

victim died of asphyxiation secondary to neck compression should not have been admitted because there was no proper basis for the opinion. Butts testified that he based this conclusion on Ms. Michaux's statement that she saw Petitioner choking the victim. Petitioner argues that this violates "Rule 702." Petitioner's second claim is that Butts' testimony improperly bolstered Ms. Michaux's testimony that Petitioner choked the victim.

## Discussion

Respondent's primary contention in response to both of Petitioner's claims is that they are procedurally barred from review in this Court. Absent cause and prejudice or a miscarriage of justice, a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule. See Harris v. Reed, 489 U.S. 255, 262 (1989). A procedural rule under which the state court has declined to consider the merits of a petitioner's claims is adequate if it is regularly or consistently applied by the state court, Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and is independent if it does not "depend . . . on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75 (1985).

Here, Petitioner raised both of his current claims on direct review and the North Carolina Court of Appeals declined to consider either of them. It did base its decision on state procedural

rules. As to Petitioner's claim that it was improper for Butts to testify that his opinion changed based on Ms. Michaux's statement, the North Carolina Court of Appeals stated that "[Petitioner] cites no authority to support this proposition and, therefore, any such argument is abandoned. N.C.R. App. P. 28(b)(6) ('Assignments of error . . . in support of which no reason or argument is stated or authority cited, will be taken as abandoned.')" Michaux, No. COA06-1040, at *4.

Regarding Petitioner's contention that Butts' testimony improperly bolstered Ms. Michaux's testimony, the North Carolina Court of Appeals noted that it was not revealed on direct examination that Ms. Michaux's statement was the source of Dr. Butt's opinion that the victim died from neck compression. Instead, Dr. Butts testified as to the source of his changed opinion only when asked for the source by Petitioner's attorney on cross-examination. The North Carolina Court of Appeals held that "[u]nder these circumstances, any prejudice suffered by defendant is not remediable on appeal because it resulted from his own trial tactics." Id. In support of its holding, it cited prior North Carolina case law dealing with invited error and N.C. Gen. Stat. § 15A-1443(c), which reads "[a] defendant is not prejudiced by . . . error resulting from his own conduct."

Certainly, the North Carolina Court of Appeals' denial of Petitioner's claims was "independent." No federal constitutional

grounds were discussed and only state procedural rules were relied upon. The only question then is whether the rules were "adequate" to support a procedural bar.

It has been noted that N.C.R. App. P. 28 "is a long standing, regularly and consistently applied procedural default rule under North Carolina law." Willoughby v. Langley, No. 303CV342-3-MU, 2006 WL 753173, at *3 (W.D.N.C. March 21, 2006)(unpublished, citing examples of its application). Likewise, Respondent cites several cases showing that N.C. Gen. Stat. § 15A-1443(c) is regularly and consistently applied. See, e.g., State v. Raines, 362 N.C. 1, 11-12, 653 S.E.2d 126 (2007); State v. Duke, 360 N.C. 110, 121-22, 623 S.E.2d 11 (2005); State v. Braxton, 352 N.C. 158, 202, 531 S.E.2d 428 (2000). Therefore, the North Carolina Court of Appeals' use of these rules in Petitioner's case was sufficient to bar Petitioner's claims from review in this Court absent a showing of cause and prejudice or a miscarriage of justice. Petitioner has not even argued that he can make such a showing. Both of his claims are barred from habeas review.

Petitioner's claims would also fail even if considered on their merits. Both claims are based on state court evidentiary rulings at trial. "Normally, the admissibility of evidence, the sufficiency of evidence, and instructions to the jury in state trials are matters of state law and procedure not involving federal constitutional issues. It is only in circumstances impugning

-8-

Case 1:09-cv-00141-TDS-DPD   Document 8   Filed 06/22/09   Page 8 of 10

fundamental fairness or infringing specific constitutional protections that a federal question is presented." Grundler v. State of North Carolina, 283 F.2d 798, 802 (4th Cir. 1960). This holding was later reaffirmed by the Fourth Circuit in Spencer v. Murray, 5 F.3d 758, 762 (4th Cir. 1993). A state procedural error does not qualify for habeas relief unless there is "'a fundamental defect which inherently results in a complete miscarriage of justice,'" or there are "'exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent.'" Short v. Garrison, 678 F.2d 364, 369 (4th Cir. 1982)(quoting Hailey v. Dorsey, 580 F.2d 112, 115 (4th Cir. 1978)).

Petitioner has not shown that his trial was fundamentally deficient or that there are any exceptional circumstances. Butts' testimony of severe physical abuse, combined with Ms. Michaux's testimony and other evidence, provided more than sufficient evidence of Petitioner's guilt even if Butts' revised opinion had not been stated in the record. Further, if anything, the fact that Butts relied on the statement of an interested party, rather than any scientific or medical evidence, to form his opinion likely weakened his testimony to the jury. In total, Petitioner's trial was not fundamentally unfair or deficient. Respondent's motion for summary judgment should be granted even if Petitioner's claims are considered on their merits.

**IT IS THEREFORE RECOMMENDED** that Respondent's motion for summary judgment (docket no. 4) be granted, that the habeas petition (docket no. 1) be denied, and that judgment be entered dismissing this action.

                                            /s/ Donald P. Dietrich
                                                **Donald P. Dietrich**
                                        **United States Magistrate Judge**

June 22, 2009